Good morning, your honors. May it please the court, my name is Carmen Corbin and I'm an assistant U.S. attorney in the District of Arizona. I represent the appellant, the United States, in this matter. I'd like to reserve three minutes of my allotted time for rebuttal, please. Your honors, the District Court erred in this case by suppressing the evidence discovered on the defendant's laptop because the forensic examination of that laptop constituted a lawful border search that required no reasonable suspicion. The mere fact that the laptop was moved from the physical border to another location in order for it to be searched did not alter the nature of that search from being a lawful border search. So your argument is that this is really a functional equivalent of the border as opposed to an extended border search? Basically, the government is arguing it could be considered a border search in the sense of, it could be a search at the functional equivalent of the border. The court could find it under that category. However, the search could also just be a plain old border search. The item had never cleared customs. Maybe I didn't make my question very clear. I understand two distinct analytical prongs. One is a border search or functional equivalent of a border, which is essentially the same thing. The other prong analytically is an extended border search. That's different because we know in an extended border search that a crossing has occurred, but the search takes place sometimes much later and in a different geographical location. And our case law seems to suggest that if it's an extended border search, you have to have reasonable suspicion in order to conduct that search. Have I got the two prongs correct? Yes, that is correct. This search was not an extended border search. An extended border search does require an actual entry of the item, the person or the item, and it also has an element of a heightened expectation of privacy. And the logic seems to come that once the item has entered the United States, basically it's been cleared by customs, it's already had that initial search and been cleared to enter the United States, that would allow for a heightened expectation of privacy. The individual would then have a different expectation of privacy than they would when they come across the border. Ms. Corman, let me ask you, and I'll ask Mr. Kirshner the same question when he's up, but it seems to me that this is really no different than a cargo container that comes into the Port of Oakland or the Port of Seattle, and it's basically under a customs bond, if you will. There's a seal on it that is not yet broken. And maybe that container gets offloaded on a ship and put on a train and carried to Chicago, or it gets opened in Chicago. Would you consider that to be the functional equivalent of the border when the cargo is inspected? Yes. I agree with that. Exactly. I think that analysis is correct. And I think that there is some case law that supports that analysis as well, that courts have found that although something that has come in, let's say, through a shipping container, is not searched at the physical border the first time it enters, it may have been searched the second or third time that it stops in the process of being delivered to where it should be. But it's still been found that that is a search at the functional equivalent of the border. Counsel? Yes. The thing that bothers me about this case is the lapse of time between the initial detention of the defendant and the time of the search. Is there any limit in your mind to the time that the materials can be retained without being searched and still have it constitute a border search? Your Honor, I believe that basically that would have to be looked at on a case-by-case basis. I think that that relates to reasonableness. And I think on a case-by-case basis, depending on what the item is and how difficult it is to find an expert who can search that item for contraband, that all might relate to the reasonableness of the time frame in which an item is searched. I think drawing a bright-line rule as to how long an item can be detained for it to be searched to be cleared by customs would be difficult, considering technology and the advances of technology and just according to what different things may come across the border. It would be very difficult to draw a bright-line rule. However, I would say in this case, yes. Counsel, it seems to me we don't want to say that it's just like cargo. When you've stopped an individual and you've taken that individual's laptop and they're waiting to cross the border. So I guess I would agree with you that we probably look at it possibly on a case-by-case basis. And when you're talking about an individual and his laptop that he wants to get cleared and to go on home, it becomes pretty difficult. Now here, the crossing was that kind of a remote crossing and you wouldn't expect it to have this fancy equipment that would allow her to have a real expert there at all times. So how do we determine reasonableness in that context? And as Judge Rawlinson said, the amount of time is a real problem. Well, Your Honor, I think your question is an important one. The Supreme Court has noted that in border searches, it has noted a difference between the searches of persons and how persons are dealt with versus property. And I think that is a key component in some respects. The individuals in this case, the defendant and his wife, were cleared by customs and they were actually allowed to enter the United States. It was just merely the property that was detained. Yeah, but when it's your laptop, you are functionally detained. I understand. Basically, though, however, in this case, the government's actions were reasonable. The government acted very quickly. I believe Agent Owen, who was the forensic agent in this case, testified at the motions hearing that this type of search can generally take months and that this one only took a matter of days. I understand that he worked the weekend to try to clear it, but it does just kind of illustrate the very difficult problem we have with this kind of property and this kind of search. It doesn't seem to me that you can continue to call it a border search and not an extended border search. So then let's turn to whether there was reasonable suspicion or whether they sometimes talk in terms of particularized suspicion. Is there a difference between those two? I don't believe there is, Your Honor. The government actually hasn't argued the reasonable suspicion argument on appeal. It was argued below. However, we did not argue that on appeal. What are you telling us, that you concede that there was not reasonable suspicion? It's just an argument the government's not arguing. I think the Court could look at the facts on its own and maybe find reasonable suspicion. If we went that way, without regard to whether or not you're pursuing it, what would the facts be that would support reasonable suspicion? I think the main things that the agents focused on when the defendant was crossing the border was the text hit. And a text hit is basically when somebody crosses the border, something can pop up on a computer system that kind of flags them for some sort of search or some heightened interest in that individual. You've got the prior conviction for sexual molestation in California. You've got the text hit, which, as I understand it from the record, was simply as part of Operation Angel Watch, we're going to enter into the computer anybody who's got a prior sex conviction who travels overseas because we're trying to stop sex tourism, right? That's correct. There's a plus here that he had to register. Yes. I think the Operation Angel Watch related to California's sex offender registration system, and I believe that's why he was inputted in there. Also, the agents, I believe two of the agents actually testified at the motions hearing that whomever they spoke to or whoever conveyed to them the information about what Operation Angel Watch watched indicated that the defendant had a prior child pornography conviction. That isn't the case as far as I know. In fact, I think the conviction was child sexual abuse, which you mentioned. 288A, right? Exactly. That's not child porn. Exactly. But putting it into the perspective of the agents that were actually there on the scene, it seemed, according to their testimony, they actually believed that there was a child pornography conviction, which obviously would relate to their interest in any laptops, photography equipment, and that type of thing because generally child pornographers use that equipment in producing and maintaining what they've produced. So is the argument that the agents had a reasonable but mistaken belief that he might be a child pornographer? Well, again, I want to state the government isn't pursuing this argument and hasn't pursued this, so I don't know how much the court wants me to go further in this argument. I'm just trying to respond to your question. Well, I'm just going to ask you hypothetically here. I believe that under the circumstances of at least what the testimony showed, there was evidence that or information that they received at the time that may have made them more concerned about those items and made them more concerned. Is the government's analysis here that they really want us to hold that this is a border search, not an extended border search? So you've dropped that argument? Is that where you're going? The government is arguing this is not an extended border search and that no reasonable suspicion was required. This was a border search. And the mere fact that the item was never cleared by customs, it never made that actual entry. Also, a part of an extended border search analysis is that the defendant had a heightened expectation of privacy. It's illogical for him to argue that there existed a heightened expectation of privacy between when he crossed the border with the item or when he came to the border to cross the border with the item and when the item went to be searched. It was detained. Counsel. Yes. That argument is a little more difficult because, as you stated previously, the individuals were cleared already. So your argument is a little more difficult when you've cleared the individuals but you haven't cleared their property as to what their expectation is. Well, I believe their expectation would remain the same. Just as any of us that come in from an international location and cross the border, we expect that our items, our personal effects, may be searched and they may be detained for that search. I think it would be more – I think the argument that the stop and search would be unreasonable would be more successful if the defendant and his wife were not cleared to enter the United States and had to wait at the port of entry while these items were searched. That could have taken longer than five days. Counsel, how long and how far from the border would your argument stand good? Your Honor, I don't believe that time and distance are truthfully the determining factors. I think it's a case-by-case basis, and that all relates to reasonableness. I think that ultimately any search that occurs before the item has cleared customs should be a border search. It is a border search that doesn't require reasonable suspicion. The time and distance that you mention I think relates more to the reasonableness of the search, and that is under the Fourth Amendment. I mean, border searches generally are determined to be reasonable under the Fourth Amendment, except for some exceptions. And, you know, reasonableness is always an issue in these cases. So in that regard, then, this is like those cases where we search the packages at the FedEx distribution center in Louisville or Nashville or wherever it is? Correct. And I think that in U.S. v. Abucci, this case – this Court actually discussed the functional equivalent of a border search and found a package that was shipped and searched far from the border and possibly not at its final location before it was shipped out of the country, and this Court found that to be a search at the functional equivalent. But, counsel, those cases were when there was a hub or it was the last place it could be searched prior to leaving the country or prior to entering the country. So those cases are a little different in that, as a practical matter, that was the place that those items could be searched. But under your viewpoint, the items could be taken anywhere in the country and it still would be a border search as long as it hadn't cleared yet. Yes. That's a little extreme. Well, and I agree. But I think the key fact to all of those functional equivalents, especially in U.S. v. Abucci, is the fact that the search was conducted at the – well, in this instance, the first practicable point where it could be searched, where it could be detained and searched. And I would say that applies in this case as well. The first practicable point where it could be searched was in Tucson, where the forensic agent was located and his laboratory was located. And so for that reason, I think it would apply. But as for it being shipped anywhere to be searched, I think, again, that would be related to reasonableness and the fact of wherever the expert is that can conduct that search, until it is cleared by customs, the government would need to wait and search that item in order to find contraband, if there was any contraband. I'd like to reserve the rest of my time. Very well. Thank you. Good morning. May it please the Court, my name is Bill Kirshner. I represent the appellee, Howard Cotterman, in this case. I would like to start off, if I might, with your question, Judge Tallman, which is – And let me give you a hypothetical that you can – Sure. – play with. Where I come from, and Judge Fletcher has her chambers in the state of Washington, we have a lengthy border just like Arizona. Some parts of that border are so remote that customs and Border Patrol can only guard it on horseback. So let's assume that Mr. Cotterman was backpacking across the border from Canada and was encountered by a Border Patrol agent on horseback. And at that point, the Border Patrol agent has no ability to conduct any kind of an examination of the computer. Would it be permissible to take the computer then to the nearest available facility in order to search its contents, or would your position be that the search has to occur right there on the ground next to the horse? It would not be our position that it would have to occur right there on the ground next to the horse, but rather that, of course, as the government has said, those are probably facts for a different case and a different time because they're not our facts. It's not that far in the sense that we've got this – I've never been to – is it Lukeville? Lukeville, yes. I've never been to Lukeville, but it sounds like it's quite a ways out there in the desert, and there's not much there but the border station. So on the assumption that there aren't forensic computer examiners and equipment on duty 24 hours a day at Lukeville, what's wrong in this case, because it was password protected, to take this computer to Tucson, where the lab is, in order to look at it? Well, that really gets to the heart of the matter in this case, which is whether it should be decided on our facts. And in our facts, the district court in this case made a distinct factual finding that this computer could have been searched there at the border at that time. Not only that. But it would have taken longer, as I understand the record, because the forensic agent said, yeah, I can come there with a laptop, but it's a slower machine, it would have taken longer, and if I run into a problem, not uncommon in forensic examination, I wouldn't have had the rest of my equipment in order to overcome the problem. And the district court mentioned that it might not be to their convenience. It could have been done there. And I think if you look at the Guzman Padilla case, you see a situation where the government could have seized a vehicle at various points. They chose to seize it at one of the later ones because they were worried that the vehicle might flee at an earlier point. And this court held that, although that was true, and perhaps that was a good point that they had, but that it was practicable to seize that vehicle at the first point. So the question really is whether it was practicable to search this computer at that time. And it was. That was found as a matter of fact by the district court. I think it's a fact that deserves deference. But the district court also made a factual finding that there was reasonableness on the part of customs in conveying the computer to the forensic lab. As Judge Fletcher noted earlier, the examiner worked overtime on the weekend in order to get the inspection completed. And we've got a finding by the district court that there was no intentional delay here. I think that the government's characterization of those findings by the magistrate judge are not quite right. I don't think the magistrate judge found that they were reasonable in a constitutional sense. He was talking about their conduct specifically. And at one point he was talking about whether even a higher standard should be applied rather than reasonable. You're not suggesting that the government should not have seized the laptop. What you're saying is that they had to have real suspicion in order to do it? Absolutely. I think that everyone concedes that they can seize people's belongings at the border if there is reasonable suspicion of a crime. And that gets to one of the distinguishing points in this case that goes to the question that Judge Tallman asked in the very beginning, which is, isn't this just like a container that comes into the country and is searched at some later point in time? But the difference here is that this was a seizure, not just a search. So when a container is being shipped, it comes into the country. It doesn't really matter to the shipper whether it's at point A or point B or point C, because they've given up custody of that package to someone else. They don't expect to retake it. So is the distinguishing feature the fact that the owner of the property does not enter contemporaneously with the property? Is that what that analysis is going to hinge on? I think that that's the strongest point for that, because it differentiates this case. When you and I walk through the first road, suppose the owner comes into the waters of the United States in a small boat with a container on it, and Customs wants to conduct a radiological examination to make sure that it doesn't contain fissionable nuclear materials, would your argument be that that inspection has to be conducted on the water or at the first port of entry? Absolutely not. The cases are very clear with boats that they can be taken to the police dock. They can be examined there. That's the functional equivalent of the border in those cases. But what you've got here is a situation. And, you know, if you distinguish the functional equivalent doctrine from the extended border doctrine, this Court held only last year in the Guzman-Padilla case, the principal distinction between the two is that the functional equivalent search takes place at the first point in time after the border is crossed. Now, the Court was not talking about those consigned shipment cases, which are clearly very different. But in the ---- But we've applied that doctrine, have we not, to the distribution center cases where the search occurs in Louisville or Nashville, even though the package has entered thousands or hundreds of miles away? Yes, the Court has applied the functional equivalent doctrine to consigned shipment cases. But this isn't a consigned shipment case. In essence, in my hypothetical, the cargo itself is under custom bond, right? For all practical purposes, it hasn't even entered the United States. The seal is broken, the doors are open, and the inspection is conducted. Yes. And I'm trying to understand what the difference is between bringing in property that cannot be searched without effective scientific equipment that isn't necessarily available at the port of entry. Well, of course, in this case, it could be searched without that scientific equipment. The district court specifically so found. But the other difference is simply the reasonable expectation of a traveler. When you and I appear at the border, we don't expect to have our goods seized as we're traveling, unless there's some indication that a crime has taken place. We are certainly not arguing that they have to have proof beyond a reasonable doubt. But, counsel, there's no reasonable suspicion required at a border search. Absolutely not. There's not for a search. But there is for a seizure, or at least there should be for a seizure,  it's not reasonable to take people's property away from them and keep it for an unlimited amount of time, which is what it seems to be. Counsel, what case do you have that makes the distinction between a border search and a border seizure? I don't think there are any cases that are directly on that point, Your Honor. I don't know of any. The government hasn't cited any cases directly on that. Counsel, is there a difference between detaining and seizing? Yes, there's a big difference. And I would analogize it to the difference between a Terry stop, which ripens into an arrest. Certainly, at some point in the Terry stop, the officer only needs reasonable suspicion to pat somebody down, allay his concerns about what's going on. But if the officer then takes that person, transports them to another place, and holds them for several days, that becomes an arrest. But the detention itself in a Terry stop must be supported by reasonable suspicion. And that's different from the doctrine that applies at the border, which requires no suspicion at all. I mean, we can tear your car apart, according to the case law, without any reason at all, other than the fact that we want to see whether or not you've modified the gas tank to hide the drug. Counsel, let's turn a moment to whether there was reasonable suspicion in this case, particularized suspicion. The government is asking us, they want to have a border search rule that they can carry property who knows how far before they search it. So they don't want us to decide this on the basis of whether or not there was reasonable suspicion. But I'm curious. We have a fellow who's on a watch list. He's got to register. He's traveled to Mexico many times, and he does have a conviction for child porn, or more than child porn. I think abuse of a minor. So don't we have reasonable suspicion? There is no reasonable suspicion in this case. And without going over the facts again, which I think you have accurately stated, I would just say that both the magistrate judge and the district court both concluded that there was no reasonable suspicion. They gave their reasons. I think that those are not an abuse of discretion, should be affirmed by this Court, should be viewed by this Court in the light most favorable to affirming their ruling. And in addition, I think it's very clear that the government has waived this issue purposely in order for their own litigation strategy, perhaps. But they have waived this issue by not bringing it up in their opening brief. In my answering brief, I specifically said the government has not addressed this, therefore I'm not going into it any further. I understand. I understand all that. I understand where the government is trying to push us. How far can we be pushed? Well, I think under Rule 28A they have waived this argument. And so I think that's their litigation strategy. They get to do that. And I don't think the Court at this point should revisit an issue like that that is not even raised by the government, that was specifically found by the courts below. So I think that that. So you don't think that we could resolve this case on an alternative basis that is supported by the facts in the record? That reasonable suspicion exists? Yes. If the government has waived that issue, I think that the Court can affirm the district court's ruling for any reason. But I don't know that the Court can reverse the district court's ruling for any reason. At least that I. Where the government hasn't pressed the argument. Exactly. Exactly. And, you know, I believe simply in terms of fairness that their waiver of it puts us behind the eight ball because we've never gotten a chance to make a full presentation of that. All I would say is that, you know, the fact that he's on a watch list just means that they're blanket putting people on watch lists. It doesn't mean that there is suspicion that a crime has actually been committed there. There's no reason to think that a crime has been committed by this guy. So, at any rate. Well, it depends on the nature of the prior conviction. I mean, had the conviction been a prior child pornography conviction, and Mr. Cotterman shows up with a history of spending a lot of time in Mexico, I guess he'd been there, what, three months or something? Yes, with his wife. With cameras and video recorders and laptops, that's getting pretty close to wondering what Mr. Cotterman's been doing in Mexico for the last three months. But I would urge the court to consider that all of the things that they found on the, you know, they conducted a very extensive search there at the border, and all of the things. Until they got into the stuff that Mr. Cotterman didn't want them to find. Correct. But all of the things that they found there at the border showed simply that it was a vacation, they were whale watching. The problem I'm wrestling with in your argument is that they couldn't conduct a complete search of the property because of the manner in which the computer was set up. And herein lies the difficulty. If I may? Yeah. I think that's just factually wrong. They could have conducted the search. That was a specific finding of the district court. And they could have asked, they could have accepted Mr. Cotterman's offer to help them access the files in this case. It's been done. He didn't offer them the passwords. He just offered to help. And when they asked for the passwords, admittedly, sometime later, he flew to Australia. Or said others had the passwords. Pardon me? Or said others had the passwords and I can't give them to you without talking to them. Right. And, I mean, certainly we've seen time and again where people will, when confronted by the police, will cooperate and let them do all kinds of things. Search, saw open gas tanks, all kinds of stuff like that. In the hope that they won't find it. That they later would not do later on after thinking about it. So I don't think that you can say that because his behavior later on was not helpful that he would not have done so at that point. Well, the problem I'm having is with your assumption. Because of the nature of the property here, you can't just say to the owner, okay, fire it up and let me see what's there. As soon as you start encountering password protected files, you don't necessarily have the tools that you need in order to complete the search. Well, I see that my time is up. But if I may answer that question. Sure. I guess I would reiterate that the court's factual findings were that they could have done that. And we've seen that in these other cases. There's a number of cases that I have cited in my brief. The Arnold case, the Rom case, the Ickes case where they asked folks to open these things up. And they did so. I've cited the Boucher case. That was my 28-J letter, which I apologize the court has stricken. The government did not ask for that part of it to be stricken. So I don't know if I can mention that to you. Counsel, there again, the proper attempt to file a SIR reply brief. You're lucky we didn't ask you to show cause-wise sanctions. I appreciate that, Judge. And I wouldn't push that one any further than you already have. You're on thin ice on that one. I accept that. I'm just saying. Judge Tomlin. The case that goes to that. Go ahead, Judge Rollins. With your permission, I would like one final question. Go ahead. Counsel, this case is very difficult. I just want to know from your perspective, why isn't this just a plain old border search? Not a functional equivalent and not an extended border search? Why isn't this just a garden variety border search? Because it took place hundreds of miles and days later. And the government has not offered a single case where anything like that has ever been considered a plain border case. They're always analyzed under either the functional equivalent doctrine or the extended border doctrine. And, frankly, my prepared remarks were to talk about why this is definitely the extended border and not the functional equivalent. I haven't been able to get to that. But there is no case in which this court has ever held that a search that took place anywhere this long after the border was crossed is a straight border search. The only case that they've come up with is a 1966 case, Belfarre, where the search took place 12 miles from the border and virtually contemporaneous with the crossing. Thank you, Your Honor. Thank you, Judge. Since you went over a little bit, I'll give a few minutes to counsel or rebuttal. Thank you, Your Honors. Let me start just at the outset. I want to comment on opposing counsel's comment that basically it's critical, I guess, to their argument that this search could have taken place at the port of entry. And he is constantly focused on how the district court found that this could have taken place at the port of entry. Judge Tallman, you did note how there were difficulties that Agent Owen testified to as to if that occurred. But I'd like to note the court's attention to U.S. v. Hill. This court discussed that exact concept, U.S. v. Hill. And in that case, this court refused to suppress evidence discovered in an off-site search based on the argument that police could have done a similar search on-site. This court in that case noted numerous reasons as to why an on-site search was not required. And many of those reasons were also indicated by Agent Owen in his testimony at the motions hearing in this case. But counsel, as opposing counsel pointed out, the district court made a finding contrary to your argument. So why do we say that's clearly erroneous? Are you referring to whether the search could have been done at the port of entry? Yes. I'm not challenging the fact that the search could have been done at the port of entry. I think Agent Owen did testify that it could have been done. It would have just taken a significant longer period of time and that he wouldn't have had equipment that could have fixed problems if problems arose at the port of entry. What my point is that basically the search would have taken significantly longer as Agent Owen testified. If it could have been done at the border and the item was taken away from the border to do the search, why doesn't that defeat your argument that it's a border search? I don't believe that the border search concept requires that it actually be searched at the physical border. I think the point is that the item never cleared customs. It never was allowed to enter the United States. It was still under that customs control and detained in order for it to be searched for contraband before it entered the United States. What's your response to opposing counsel's argument that you don't have one case that says a search is a border search where the item was taken far from the border and wasn't searched immediately? What's your response to that argument? I think that's correct. I think there isn't a case directly on point. I think the Balfari case, which he mentioned, is probably the closest. But there isn't a case that's directly on point. But I would also counter that with there isn't a case that's directly against that argument. So you want us to make some law? Well, basically, Your Honor, the government is not asking this Court to destroy the Fourth Amendment, as the defendant has noted and alleged in his briefs. I hope not. The government is basically saying that this search in this case was within the parameters of a border search that has been deemed lawful and reasonable under the Fourth Amendment by case law and by statutes. And for this reason, we would ask this Court to reverse the court's order. Thank you very much, counsel. The case just argued is submitted. Because of the need for hooking up an inmate by telephone in the next case, we're going to have to take a recess. I hope it will only be for about 10 minutes. But our technicians are here to accomplish that fact. And Mr. Copeland, if you'd let us know when you're ready, we'll be in recess. Thank you.
judges: Fletcher B. , Tallman, Rawlinson